IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING DIVISION

**AXIALL CORPORATION,**

    **Plaintiff,**

v.      Civil Action No. 5:20-CV-117 (Bailey)

**INTERNATIONAL CHEMICAL WORKERS UNION COUNCIL OF THE UNITED FOOD AND COMMERCIAL WORKERS and INTERNATIONAL CHEMICAL WORKERS UNION COUNCIL OF THE UNITED FOOD AND COMMERCIAL WORKERS, LOCAL UNION NO. 45C,**

    **Defendants.**

ELECTRONICALLY FILED
Jun 16 2020
U.S. DISTRICT COURT
Northern District of WV

## COMPLAINT

Plaintiff Axiall Corporation ("Axiall"), for its Complaint against Defendants International Chemical Workers Union Council of the United Food and Commercial Workers and International Chemical Workers Union Council of the United Food and Commercial Workers, Local No. 45C, states as follows:

### I.  SUMMARY OF THE CAUSE OF ACTION

1. On May 13, 2020, Arbitrator Charles S. Dunn ordered Axiall to reinstate with back pay a convicted arsonist to its chemical plant containing dangerous and highly flammable chemicals. Without having the benefit of examining the criminal file, Arbitrator Dunn disagreed with the Honorable David W. Hummel, Jr., Judge of the Circuit Court of Marshall County, West Virginia, as to the gravity of the arsonist's offense and ordered him reinstated and paid back pay. In doing so, Arbitrator Dunn substituted his own personal notion of right and wrong for a duly

11373003

elected Circuit Court Judge and exposed the employees of the chemical plant as well as the residents of the neighboring communities to unnecessary safety risks.

2. Exceeding his powers, Arbitrator Dunn's opinion shocks the conscience, is a manifest disregard of the law, and is contrary to public policy, as explained in this Complaint. Thus, Arbitrator Dunn's opinion must be set aside and vacated.

## II. JURISDICTION AND VENUE

3. This action arises under section 301 of the Labor Management Relations Act ("LMRA") of 1947, as amended, 29 U.S.C. § 185. The Court has jurisdiction over this action pursuant to that provision and 28 U.S.C. §§ 1331, 1337, 2201, and 2202.

4. This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b) and 29 U.S.C. § 185.

## III. PARTIES

5. Plaintiff Axiall is a corporation organized and existing under the laws of the State of Delaware, with its principal office in the city of Houston, Texas. Axiall operates a chemical manufacturing plant in Natrium, West Virginia ("the Natrium Plant"), which is located in Marshall County, and is engaged in the business of manufacturing and selling chemicals, which are sold and shipped through interstate commerce. The Natrium Plant employs approximately 400 people, and there are also contractors and others who are often on the plant premises. Axiall is, therefore, an "employer" within the meaning of 29 U.S.C. § 152(2) of the LMRA.

6. Defendants International Chemical Workers Union Council of the United Food and Commercial Workers and International Chemical Workers Union Council of the United Food and Commercial Workers, Local No. 45C (jointly referred to as "the Union") are labor organizations which represent for collective bargaining purposes the production and maintenance employees at

the Natrium Plant. Therefore, Defendants are labor organizations which represent employees in an industry affecting commerce within the meaning of 29 U.S.C. §§ 152(5), 185.

### IV.    COLLECTIVE BARGAINING AGREEMENT

7.     Axiall is a signatory to a collective bargaining agreement ("the CBA") with the Union. Articles VI ("Complaint and Grievance Procedure") and VII ("Arbitration") of the CBA provide for the mandatory peaceful settlement of all disputes. If not resolved in earlier steps of the grievance procedure, the dispute may culminate in arbitration, which is covered at Article VII. In resolving disputes, the arbitrator's authority is limited to the application and interpretation of the terms of the CBA. Article VIII ("Disciplinary Action") of the CBA gives Axiall the right to discharge an employee for just cause.

### V.    EVENTS LEADING TO ARBITRATION

8.     The Natrium Plant sits on a salt bed, and Axiall extracts the salt from the ground to make various chemical products, such as calcium hypochlorite, chlorine, caustic and hydrochloric acid.

9.     One of the departments at the Natrium Plant is the Calcium Hypochlorite ("Cal-Hypo") Department. The Cal-Hypo Department produces calcium hypochlorite, a chemical that is mainly used for water treatment. The Natrium Plant produces up to 120 tons of Cal-Hypo per day. Cal-Hypo is regulated as a Class 3 oxidizer. As an oxidizer, Cal-Hypo releases oxygen and produces heat when it decomposes. Due to the oxygen and heat that is produced as Cal-Hypo decomposes, Cal-Hypo can speed up the development of a fire and can make a fire worse and more intense. In short, in the words of the arbitrator, Cal-Hypo is a "fire hazard" and "is highly combustible."

10. Michael McGovern was employed at the Natrium Plant as an "E-Man" in the Cal-Hypo Department. The Cal-Hypo Department has four operating jobs, and one of those operating jobs, the Dry Side Operator, has two employees who fill that job. Because the plant operates seven days a week, 24 hours a day, and because the employees rotate through three different shifts throughout the month, there is an extra shift that needs to be covered five days a week for each of those employees. In his role as an E-Man, McGovern was the employee in the Cal-Hypo Department who worked that extra shift for each of the operating positions. As a result, during his five-day work week, McGovern would move throughout the entire Cal-Hypo Department by working each operator position on a different day. Generally, McGovern operated independently and by himself without direct oversight during most of his shift.

11. In addition to having access to Cal-Hypo, the employees in the operator positions within the Cal-Hypo Department had access to other dangerous chemicals and gases in other sections of the plant, such as chlorine, which if intentionally released by the employee could cause significant harm to other employees, to the environment and to the community. In fact, Axiall is currently defending a number of cases in West Virginia state courts as a result of a chlorine leak that allegedly caused damages in nearby communities.

12. In 2012, there were two significant fires in the Cal-Hypo Department. One fire was in the area where Cal-Hypo was packaged, and the other fire was in the warehouse where Cal-Hypo is stored.

13. The packaging floor fire was an extraordinary fire. Indeed, the packaging area ceiling was 20 to 25 feet high and the fire was seen coming out of the packaging area roof. Due to the size of the fire, in addition to the Natrium Plant's Emergency Crew that was dispatched to the fire, outside fire fighting resources were dispatched to the plant; State Route 2 was closed; and

part of the plant was evacuated. Moreover, one employee suffered an inhalation injury as a result of the fire.

14. The warehouse fire was even more significant than the packaging floor fire. With the warehouse fire, outside fire fighting resources were again dispatched to the plant; State Route 2 was closed; State Route 7 in Ohio was closed; much of the plant was evacuated; and railroad and Ohio River traffic were shut down. Moreover, three warehouses, the transport path and all of the Cal-Hypo product in those warehouses were destroyed in the fire. Thankfully, due to quick action at the plant, no one was injured by this fire.

15. On February 13, 2018, a fire was intentionally set at a bar owned by McGovern. As a result of that intentionally set fire, McGovern was indicted by the Marshall County Grand Jury on July 10, 2018 for the following four felonies: (1) Second Degree Arson; (2) Conspiracy to Commit Second Degree Arson; (3) Fourth Degree Arson; and (4) Burning or Attempting to Burn Insured Property. In January 2019, and via an Information, McGovern was also charged with a fifth felony, "Attempted Insurance Fraud."

16. On January 22, 2019, The Honorable David W. Hummel, Jr., Judge of the Circuit Court of Marshall County, West Virginia, conducted a plea hearing regarding McGovern's felony charges. According to the transcript of the plea hearing, before Judge Hummel could accept McGovern's plea, Judge Hummel "had to be sure [that McGovern] was making his plea willingly, knowingly, [and] voluntarily; that nobody had promised him anything outside the Plea Agreement itself; that he had not been coerced or forced into making this plea; that he knew what it was that he has pleading 'Guilty' to; and that he understood the possible consequences."

17. During the plea hearing, Judge Hummel accepted and filed McGovern's Constitutional Rights Form, which was signed by McGovern and which set forth in detail that

McGovern understood that he was waiving various Constitutional rights and that he was voluntarily entering a plea to the criminal charges. McGovern admitted, under oath, that he signed this Constitutional Rights Form with the understanding that no promises had been made regarding his sentence or disposition of the case.

18.     With regard to the criminal charges that were pending against him, McGovern further testified during the plea hearing that, while under the influence of drugs, he conspired to burn down the bar and collect the insurance money; that when he left his bar that night, he expected co-conspirator Codi Daugherty to burn it down for insurance money; that it was McGovern's decision to plead guilty; and that he was not influenced in any way by a threat, promise or reward from anyone.

19.     During the plea hearing, McGovern also testified as follows:

> I do not dispute what the Prosecutor said. I was in a bad place[.] I had an addiction problem. I conspired to burn down the building to collect the insurance money. I told Codi I didn't care if the building would burn down. I had a mutual agreement with Codi. I expected him to burn it down and I was to collect the insurance money.

20.     During the plea hearing, Judge Hummel found that there was a factual basis to accept McGovern's pleas. In open court, McGovern then pled "Guilty" to the following five felonies: (1) Second Degree Arson; (2) Conspiracy to Commit Second Degree Arson; (3) Fourth Degree Arson; (4) Burning or Attempting to Burn Insured Property; and (5) Attempted Insurance Fraud.

21.     On February 19, 2019, Judge Hummel conducted a sentencing hearing regarding McGovern's charges. During the sentencing hearing, Judge Hummel stated that [unlike the arbitrator in this case] he had presided over the criminal case from the beginning; that he watched three to four hours of interviews of McGovern by the Marshall County Sheriff's Department; that

11373003

he listened to a police interview of Codi Daugherty; and that he had read everything that he had been provided in the case.

  22. During the sentencing hearing, Judge Hummel made the following statements regarding McGovern's conduct:

    a. That McGovern's conduct was "abhorrent";

    b. That to call McGovern's conduct "non-violent" was an insult to the Court's intelligence;

    c. That McGovern had pled guilty to arsons, which were violent crimes;

    d. That McGovern lied for two-and-a-half-hours of his three-and-a-half-hours interview with the police;

    e. That the Judge did not know why this case had gotten so much media attention;

    f. That this case "was not a regular arson. This was going to be something like on 'Die Hard.' The gas valves were all open";

    g. That the bar's surveillance videos depicted McGovern showing his co-conspirator, Daugherty, where everything was; that Daugherty was carrying out McGovern's plan; and that it was going to be "explosive";

    h. That "none of this happens" but for McGovern;

    i. That this incident was not a spur-of-the-moment idea that was fueled by drugs but had been planned;

    j. That McGovern was too much of a coward to carry out the act himself and that he enlisted Daugherty to do his dirty work;

    k. That Daugherty was a victim as well, as McGovern's overbearingness lured Daugherty, who McGovern knew to be a drug addict;

    l. That McGovern intended for the bar to be burned to the ground in the morning or blown up;

11373003

      m.      That this incident was not just an arson but that the building was intended to explode;

      n.      That the gas was on in the building when the firefighters arrived;

      o.      That, according to the 2017 FEMA report, eighty-seven firefighters had been killed, including thirty-seven from rural fire departments; that at least two dozen volunteer firefighters responded to the scene at McGovern's bar; that an unknown number of deputy sheriffs and first responders responded to the scene; and that none of them knew if they were returning home that day after responding to this fire;

      p.      That McGovern put all of these individuals' lives in jeopardy and that such conduct was violent; and

      q.      That, just prior to the sentencing hearing, McGovern was subjected to a drug test and "Subutex not currently prescribed" was found in McGovern's system.

23. Judge Hummel concluded the sentencing hearing by stating that he was sending McGovern to prison, that the Judge was maxing out all of the sentences and that he would run the sentences concurrently.

24. Contrary to one of the Arbitrator's findings, Axiall **first** became aware of McGovern's criminal convictions **after** learning about the February 19, 2019 sentencing hearing. Upon learning of McGovern's criminal sentence, Axiall placed McGovern on paid suspension, pending Axiall's investigation. McGovern was advised not to be at the Natrium Plant or on its property while on suspension.

25. Contrary to the Arbitrator's findings, the records show that Axiall did conduct an investigation by reviewing the criminal charges and the sentencing hearing transcript and by attempting to interview McGovern. Despite having a Union representative present, McGovern refused to be interviewed without the Local Union President in attendance, and the Union never requested a second interview so that Axiall could take McGovern's statements into account.

8

11373003

26. After conducting an investigation and after consulting with the corporate HR and Legal Departments, Axiall made the decision to discharge McGovern. Axiall determined that McGovern's conduct violated the Rules Covering the Operation of the Plant ("Rules"), which gave Axiall the right to discharge McGovern for his improper conduct. Pursuant to these Rules, the Natrium Plant's Disciplinary Committee has the right to review any improper conduct that is not specifically identified in the Rules and determine what classification to assign the conduct, i.e., a minor offense, a major offense or an intolerable offense. The Disciplinary Committee found that McGovern's conduct rose to the level of an intolerable offense, which is a level that permits discharge on the first offense.

27. On March 8, 2019, Axiall advised McGovern of its discharge decision. Axiall based its discharge decision on the following reasons, each of which represented a separate and independent reason that constituted just cause for discharge:

    a. Axiall discharged McGovern because he was an admitted and convicted arsonist. Due to the intentional and criminal acts that McGovern had admitted to committing, Axiall found that McGovern was unqualified and unfit to work in its chemical plant containing highly combustible and flammable materials. There were a litany of things that McGovern could do if he had a bad day, or was in a "bad place" again, and wanted to cause harm. Axiall determined that McGovern's conduct created serious safety concerns and liability issues, and, as a result, Axiall could not continue to employ a known and admitted arsonist in a chemical plant, where flammable and dangerous chemicals to which he had easy access while working alone, were present. Moreover, in the sentencing hearing transcript, Judge Hummel made many statements that Axiall found to be disturbing and relevant to its decision. For instance, Judge Hummel found that McGovern's conduct was abhorrent and repugnant and found that McGovern had committed

a violent crime. Additionally, Judge Hummel found that McGovern had left the natural gas on so that the bar could burn to the ground or blow up. Judge Hummel did not view this incident as a "regular arson." Rather, since the gas valves were left open, Judge Hummel found that McGovern planned for this arson to be an explosive situation, which put the lives of two dozen volunteer firefighters and an unknown number of deputy sheriffs and first responders in danger.

      b.      Axiall also discharged McGovern because Axiall has the right to protect its business relationships and reputation. McGovern was an admitted and convicted arsonist, whose case, as Judge Hummel noted, had received a lot of media attention. There were several media articles about the sentencing, which is how Axiall became aware of his crimes, and the case was also discussed on the local television stations. Axiall had the right to protect its business reputation, which could likely be harmed by continuing to employ an admitted arsonist who exposed innocent lives in the community to serious injury or death.

      c.      A third reason Axiall discharged McGovern was his dishonesty. In pleading guilty to attempting to defraud an insurance company, McGovern publicly displayed a criminal act of dishonesty. Moreover, Judge Hummel observed that, during McGovern's three-and-a-half-hour interview with the police, McGovern lied for two-and-a-half-hours. Again, the Natrium Plant is a chemical plant containing dangerous and combustible materials. For safety and other reasons, Axiall relies upon its employees to be honest, as the employees must honestly report issues in the chemical plant as they arise during their shift and must honestly report information from their rounds that are taken during their shifts.

      d.      Finally, Axiall discharged McGovern because of his absenteeism during his incarceration. Because McGovern had been sentenced to prison for his five felony convictions for a significant amount of time, and because Judge Hummel ruled, as reflected in the sentencing

hearing transcript, that McGovern was going to prison, Axiall knew that McGovern would be absent from work for months, at a minimum. McGovern's inability to attend work for months violated Axiall's absenteeism rules and violated the CBA.

28. McGovern was incarcerated from March 19, 2019 until on or about August 13, 2019.

## VI. GRIEVANCE AND ARBITRATION

29. The Union filed a grievance over Axiall's decision to discharge McGovern from his employment. The grievance proceeded through the CBA's grievance and arbitration process. Arbitrator Dunn was assigned to hear and resolve the disputed matter, and on February 5, 2020, an arbitration hearing was conducted in Wheeling, West Virginia.

30. Arbitrator Dunn rendered an opinion and award on May 13, 2020, ordering Axiall to reinstate McGovern into his position, and provide him back pay.

## VII. IMPROPER AWARD

31. First, Arbitrator Dunn acted outside the scope of his contractually delegated authority, violated his duty to accept Judge Hummel's findings and conclusions that had been made within Constitutional guidelines, and violated public policy by substituting his judgment on the gravity of McGovern's offenses for the judgment of both the Judge and Axiall. Arbitrator Dunn began by observing that the "Judge colorfully describe[ed] the heinous nature in which he viewed the Grievant's conduct." Arbitrator Dunn then criticized and demonstrated his disagreement with the Judge's handling of the plea and sentencing hearings and with the Judge's sentencing decision using, among others, the following words:

(a)     "The sentencing transcript and the entire handling of the Grievant's case [by Judge Hummel] was extraordinary and not a credible portrayal of the nature of the threat the Grievant's conduct poses to his employer."

(b)     "[T]he Judge berated the grievant and his behavior in uncommonly harsh terms…"

(c)     "The judge characterized the setting of the fire to [sic] a premeditated attempt to cause an explosion by leaving a gas valve open.  He found that that could have created a conflagration like something out of the movie Die Hard [sic].  What seems more fitting of the facts, however, is that he Grievant's intoxicated co-defendant didn't think to turn off the gas to the kitchen stove before starting a fire on a couch in an apartment away from the kitchen."

(d)     "The Judge wailed at the possibility that lighting such a conflagration could have killed emergency responders who would leave families to mourn their losses."

(e)     "I do not here find that the Grievant's conduct was not reprehensible and very dangerous.  But the Judge's characterization of it exaggerates the facts beyond usefulness to evaluating the case."

(f)     "Undue reliance on [the Judge's] bombast seems to have caused the Company to abandon its obligation to make an independent review of the Grievant's conduct and the effect that that had on his employability at the plant."

(g)     "Of great importance to the Judge was the fact that the Grievant's co-defendant had been sentenced to prison and he believed that, as the chief instigator of the crime, the Grievant ought to serve at least as much time as the man he took advantage of and used as a villainous tool.  The Judge deemed it unworthy of consideration, however, that the co-defendant

11373003

was in prison only because, unlike the Grievant, he was unwilling to accept treatment for his drug addiction in exchange for leniency."

(h) "Even after the Judge made known his personal interest in giving the Grievant the maximum penalty, and even after the Judge rejected a plea bargain for a lessor [sic] punishment, and even after the Judge took gratuitous sideswipes at the Grievant's counsel for zealously, and with reason, arguing on behalf of his client, the Assistant Prosecutor stood and repeated to the Judge the interest of the state: simply to get a felony on the record, to get cooperation in the case and information regarding drug use in the area, to get the Grievant into treatment for his drug addiction and to *put him in a position to work while under sentence*." (emphasis in original)

(i) "Only the Judge in his discretion wanted more than a pound of flesh from the Grievant in punishment for his crime, *but even the Judge agreed to delay the onset of his sentence so that the Grievant could continue to work at the plant*." (emphasis in original) [Of course, no one had consulted with Axiall to determine whether continuing to work at the plant was an option. More importantly, McGovern's lawyer had mistakenly explained to the Judge that McGovern would be vested in his retirement benefits in about a month from the date of the hearing. That was not true, but the record reveals that the Judge relied upon those representations in delaying the sentencing].

(j) "It is not unusual for multiple charges to result from single criminal acts. It is common for the Prosecution and the Defense to then sift through those charges, evaluate the seriousness of the underlying offense and come to an agreement regarding the proper disposition. It remains for the Judge to approve or disapprove of that decision. But the State's opinion in the matter is recognized in the criminal justice system as being worthy of weight and due

consideration. *Consideration of that opinion nor the underlying facts on which it was based seems not to have been afforded the Grievant [by the Judge] in this case."* (emphasis added).

### VIII. PUBLIC POLICY VIOLATIONS

32. Arbitrator Dunn correctly noted that he was "not [to] simply substitute his judgment for that of the Company with regard to the discipline imposed if he finds that improper conduct was committed." Yet, that is precisely what he did. First, Arbitrator Dunn admitted – as he had to – that McGovern was convicted of five felonies, four of which involved arson offenses. He also admitted that the Natrium Plant, and the Cal-Hypo area in particular where McGovern worked, contained dangerous and highly flammable chemicals and gases. He further admitted that McGovern essentially worked alone and had easy access to these and other chemicals and gases. Then, he proceeded to reverse direction and bash Judge Hummel's findings as well as Axiall's reasonable reliance on them.

33. Arbitrator Dunn wrote: "It seems that the Company was unduly influenced by the Judge's findings. . . in making its decision to discharge the Grievant and gave little consideration to the underlying facts." Of course, Judge Hummel's findings and conclusions were based upon his detailed review of the underlying facts as set forth in the record before him, a record to which Arbitrator Dunn did not have access.

34. Arbitrator Dunn's opinion and award must be vacated because it violates clearly established public policy. First, without having reviewed the criminal records, he substituted his judgment for the judgment of the Circuit Court Judge on the seriousness of the offenses and on Judge Hummel's sentencing decisions. Arbitrator Dunn's disagreement with Judge Hummel is clearly outside the scope of his contractually delegated role as an arbitrator and cannot be permitted

to stand in this case. The arbitrator's words, quoted above, demonstrate that he substituted his own notion of right and wrong for the considered judgment of the Circuit Court.

35. Second, in the context of occupational safety, both federal and West Virginia law recognize the importance of employees having a reasonably safe environment in which to work. West Virginia Code Section 21-3-1 provides that "[e]very employer shall furnish employment which shall be reasonably safe for the employees therein engaged and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render employment and the place of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees[.]"

36. Similarly, pursuant to the Occupational Safety and Health Act ("OSHA"), 29 U.S.C. §§ 651 *et seq.*, "Congress declares it to be its purpose and policy . . . to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources . . . by encouraging employers and employees in their efforts to reduce the number of occupational safety and health hazards at their places of employment[.]" 29 U.S.C. § 651(b)(1). OSHA further provides that "[e]ach employer . . . shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees[.]" 29 U.S.C. § 654(a)(1). This obligation, referred to as the General Duty Clause, encompasses foreseeable acts of workplace misconduct and violence. A recognized factor in foreseeability is prior related criminal misconduct.

37. In reaching his decision, Arbitrator Dunn has ordered the reinstatement of an admitted and convicted arsonist back into a chemical plant that even Arbitrator Dunn recognizes has numerous dangerous and flammable chemicals and hazardous materials. Such a decision

11373003

creates a potentially dangerous and unsafe situation for the surrounding community, other employees, contractors and visitors at the Natrium Plant as well as the environment. Indeed, four employees, two of whom had experienced the two previous Cal-Hypo fires described herein, testified that they did not feel comfortable with McGovern being reinstated due to the safety risk he presented. If he is reinstated to employment at the Natrium Plant, McGovern will have unfettered access to these flammable chemicals and hazardous materials which, if used improperly, could cause extraordinary harm to his co-workers, contractors, visitors and the residents of the Ohio Valley region.

38. As noted above, the Cal-Hypo Department, the department where McGovern was ordered by the arbitrator to return to work, manufactures Cal-Hypo, which is a Class 3 oxidizer that can be used to speed up the development of a fire and can make a fire worse and more intense. In fact, using Cal-Hypo to cause a fire can easily be achieved by simply causing any organic material, such as oil, hydraulic fluid or even a can of soda, to come into contact with Cal-Hypo.

39. During the arbitration hearing and in the post-arbitration briefing, a meaningful nexus was established between McGovern's off-duty criminal conduct and his employment at this chemical plant. That nexus was based on the Natrium Plant's need to provide a safe environment by discharging an admitted and convicted arsonist who had been sent to prison for his criminal conduct. In his opinion and award, Arbitrator Dunn found that Axiall "well proved that the plant is a dangerous work environment, and that fire is a hazard that must be constantly guarded against, and any employee with a desire to start a fire could easily do great damage to the plant, its employees and the community at large." Despite this, Arbitrator Dunn refused to find that a meaningful nexus existed. In refusing to find that a meaningful nexus existed under these circumstances, Arbitrator Dunn violated public policy by infringing on the Natrium Plant's ability

to provide a reasonably safe environment and to protect employees, contractors, visitors and the neighboring communities from the potential of great harm.

40. In an effort to justify his decision, Arbitrator Dunn ignored Judge Hummel's findings and substituted his own personal notions of right and wrong by characterizing Judge Hummel's statements as "exaggerations" and "bombast[ic]". Arbitrator Dunn even excused McGovern's lying to the police authorities for 2 ½ hours because McGovern was "intoxicated and trying to extricate himself from that situation [arson]." Moreover, instead of determining whether Axiall had just cause to discharge McGovern based on the information and evidence that Axiall had and relied upon at the time the discharge decision was made, Arbitrator Dunn chose to substitute his own personal judgment for the judgment of an elected judicial officer, whose very job was to evaluate the criminal conduct of individuals who appeared before him.

41. Arbitrator Dunn's opinion and award must also be vacated because it reflects merely the arbitrator's own personal notions of right and wrong and reflects the arbitrator's own personal notions of criminal and industrial justice. As a result, the opinion and award fails to draw its essence from the CBA.

42. Based on conduct that resulted in McGovern's conviction and incarceration for arson and other arson related felonies, McGovern has shown that he can engage in dangerous criminal conduct, and that he is just one momentary bad decision away from engaging in other criminal conduct in the future. Moreover, McGovern has had a history of admitted drug abuse. At the sentencing hearing, he even tested positive for a prescription drug that he was not then prescribed to take. The risks of returning McGovern to his employment at a chemical plant are too great and justify the plant's decision to discharge McGovern. Arbitrator Dunn's failure to find that Axiall had just cause to discharge McGovern, based at least in part on his improper

disagreement with Judge Hummel's findings on the gravity of McGovern's offenses, is in direct contravention of the public policy of providing employees with reasonably safe work environments.

43. For the foregoing reasons, Arbitrator Dunn exceeded the powers contractually delegated to him, and his opinion constitutes a manifest disregard of the law, is against public policy, and is unenforceable. Therefore, Arbitrator Dunn's opinion and award should be vacated and set aside.

**WHEREFORE**, Axiall Corporation respectfully requests that the Court:

1. Vacate Arbitrator Dunn's May 13, 2020 opinion and award; and

2. Order such other and further relief as the Court deems proper and necessary under the circumstances.

STEPTOE & JOHNSON PLLC
OF COUNSEL

/s/ C. David Morrison
C. David Morrison   (WV ID #2643)
Jeffrey M. Cropp    (WV ID #8030)
400 White Oaks Boulevard
Bridgeport, WV 26330
(304) 933-8000

*Counsel for Axiall Corporation*

11373003