IN THE MATTER OF ARBITRATION

BETWEEN

INTERNATIONAL CHEMICAL WORKERS' UNION
COUNCIL, LOCAL 45C

AND                                              FMCS No. 201008-00202

AXIALL CORPORATION, A WESTLAKE COMPANY

Charles S. Dunn, Arbitrator

|  |  |
|--|--|
| Grievant: | Michael McGovern |
| Grievance: | Discharge |

| | |
|--|--|
| Hearing: | February 5, 2020 |
| Union Brief: | March 23, 2020 |
| Company Brief: | March 23, 2020 |
| Decision: | May 11, 2020 |

===========================================================================

STATEMENT OF THE CASE

This labor arbitration case arises under the grievance and arbitration provisions of a
collective bargaining agreement dated August 17, 2016, between Axiall Corporation Chemical
Division and International Chemical Workers' Union Council and Its Local No. 45C.  It concerns
a grievance dated March 11, 2019, filed on behalf of Mike McGovern.  The Statement of the
Grievance says, "The Union protests the termination of Mike McGovern on March 8, 2019.  The
Union asks that the grievance be made whole for all lost wages and benefits."  The Company
responded, "The grievance is denied.  There is no violation of the collective bargaining
agreement.  The discipline was for just cause."

The grievance was processed through the grievance and arbitration provisions of the
agreement.  It was submitted to arbitration and the undersigned was selected as arbitrator
from a panel supplied by the Federal Mediation and Conciliation Service.  A hearing was had

on February 5, 2020, in Wheeling, West Virginia, at which time both parties were afforded a full opportunity to present evidence, cross examine opposing witnesses and argue their positions. Briefs were submitted by the parties and received on March 23, 2020, at which time the matter was deemed submitted for decision.

SUMMARY OF THE EVIDENCE

The Company owns a chemical manufacturing plant in Natrium, West Virginia, on the Ohio River. That plant produces various chemical products, including calcium hypochlorite, chlorine, caustic and hydrochloric acid. Its location on a salt bed is crucial as brine is used in the manufacture of the chemicals. The Natrium plant is organized into departments based on function. The Grievant worked in the Cal-Hypo department which produces a chemical known as calcium hypochlorite. That chemical is produced in various forms to be used in water purification. The plant also has a PELS department, producing another chlorine based product, a chlorine department, a caustic department using sodium from the salt brine, a power department that uses hydrogen byproduct from the chemical production to power boilers, and a maintenance department. The plant employs approximately 400 employees, with 300 of those employees being bargaining unit employees.

The plant produces up to 120 tons of Cal-Hypo a day. It is sold to municipalities for water treatment, to pool stores for treating swimming pool water, and to the poultry and vegetable industry, again for purification. It is a Class 3 oxidizer. As it decomposes it produces heat and oxygen which creates a fire hazard. Two significant fires involving Cal-Hypo at the plant have occurred. Cal-Hypo can decompose in the presence of water and also in the presence of a low pH material such as a can of soda. As a result care has to be taken with handling Cal-Hypo, even in matters such as sweeping and disposing of spills. Because of its combustibility Cal-Hypo is limited in the amount any place can have on store at a time.

The Grievant was employed as an E-man in the Cal-Hypo department. That department uses five operators who rotate through three shifts throughout the month operating the plant twenty-four hours a day, seven days a week. This rotation results in a need for one

additional employee to work one shift a day each week.  The E-man fills that function, working each operator position on different days.

The control operator monitors the whole process from the control room using computer monitors and a digital control system.  He controls valve positions and responds to alarms that notify him that something is out of range.  The control operator also monitors the chlorine vaporizer which vaporizes chlorine gas that has been liquified in another part of the plant for use in the Cal-Hypo production.  The control operator works alone most of the time.  He also monitors the waste treatment area of the process to insure that the materials are being properly treated.

The area operator is in charge of the wet side of the process.  That is the process where wet chemicals are combined and the product is formed into a slurry.  The operator runs a lab analysis on sample streams and he is responsible for anything involving the chlorine vaporizer and the chlorinator systems.  The area operator works largely on his own.

Two dry side operators work each shift.  They deal with the slurry after it gets filtered and pressed.   One handles the processing equipment and the other attends to packing.  They each have time working alone.

The Cal-Hypo operator is responsible for the filter presses which separate the slurry into wet and solid materials.  The operator also uses a dryer that heats up to over 400 degrees and an emergency scrubber.  The Cal-Hypo operator works alone for most of his shift.

John Bensinger is the Senior Human Resources Partner at the plant.  As such he is responsible for handling discipline and grievance issues.  He has been in that position for thirteen years with the plant after working in labor related positions in Michigan for more than eight years.  He has a bachelor's degree in industrial management and a master's degree in human resource and labor relations from Michigan State University.  He testified regarding the findings the Company made and the decision making process that led to the Grievant's discharge.

The Company became aware that the Grievant had been convicted of five criminal offenses stemming from his attempt in January 2018 to burn down a bar he owned. His sentencing occurred in February 2019, at which time the Company suspended the Grievant pending investigation. The Company has a disciplinary committee to review such matters. It obtained and reviewed the transcript of the Grievant's guilty plea and the transcript of his sentencing. It obtained a docket sheet showing the criminal charges against the Grievant and the four indictments and one Information used to charge the Grievant with five felonies. He was sentenced to prison, serving from March 19, 2019, until August 13, 2019. The Disciplinary Committee ultimately deferred the decision regarding discipline to the Human Resources department and legal counsel, but it concluded that his conduct rose to the level of an intolerable offense. Under the plant rules an "Intolerable Offense" is an act of misconduct that warrants discharge on the first offense.

Bensinger tried to interview the Grievant by telephone. The Union vice-president was present during the interview, but the Grievant requested the presence of the President. Bensinger mistakenly believed that having the vice-president present was sufficient, but he later learned that the Grievant had the right to choose his own representation. The Grievant did not answer any questions during the interview and said nothing that was relied on by the Company in making its disciplinary decision. A second interview was neither requested by the Union nor conducted.

The Grievant was convicted of five felonies as a result of his attempt to burn down the bar he owned: second degree arson (for soliciting another person to burn the bar), conspiracy to commit second degree arson (for conspiring with two other individuals to burn the bar), fourth degree arson (for burning personal property in the bar), burning or attempting to burn insured property (again for burning the bar which was insured), and attempted insurance fraud (again for burning the bar which was insured for the purpose of obtaining insurance proceeds). Although the Grievant was convicted of five felonies they all result from one act of misconduct, compelling a co-conspirator to burn his bar down for the insurance proceeds. Various efforts

Page 4

to plea bargain were unsuccessful as a result of the Judge's determination to impose a more severe penalty. On February 19, 2019, the Judge imposed maximum sentences on the Grievant, but made it known that he would likely be released when his co-conspirator was released from prison.

After deliberations by the disciplinary committee and consultation with legal counsel and the Human Resources Department the Company, represented by Jerry Mullens, Plant Manager, and John A. Bensinger, discharged the Grievant by letter dated March 8, 2019. The discharge letter states:

> This letter is to advise you that your employment at Westlake Chemical Corporation, Natrium Plant, is hereby terminated, effective immediately. As you know, you recently waived your right to a jury trial and pled guilty to the following five felonies: (1) Second Degree Arson, for setting fire to, or causing to be set fire to, McGovern's bar, in Marshall County; (2) Conspiracy to Commit Second Degree Arson, related to the attempt to burn McGovern's bar; (3) Fourth Degree Arson, for attempting to burn or cause to be burned or attempts to aid or entice another to burn video lottery machines belonging to Wheeling Coin that were situated at McGovern's bar; (4) Burning or Attempting to Burn Insured Property with the intent to defraud an insurer; and (5) Attempted Insurance Fraud.
>
> Judge Hummel, who sentenced you, rejected your attorney's proposal for a less severe sentence and found that your conduct was abhorrent and repugnant. He found that you committed a violent crime. You intended to burn the bar while leaving the natural gas on, so that it would burn to the ground or blow up. The judge did not view this as "a regular arson," but rather, he pointed out that the gas valves were all open, and it was going to be "explosive." The judge found that you planned this to happen, This exposed at least two dozen volunteer firefighters—and an unknown number of deputy sheriffs and first responders—to the risk of serious injury or death. Even you conceded at your sentencing hearing that your actions were "drastic and detrimental to all involved," and "people...could have been injured." Importantly, the judge noted that "[n]ot incarcerating you may or could encourage similar criminal activity."
>
> As you know, the health and safety of our employees and our communities is one of Westlake's core values. Westlake is obligated to protect the safety of its employees, vendors, contractors and visitors that enter its property as well as the general public against harm that could be caused by damage to its manufacturing facility or from any other threat of harm. The underlying intentional and criminal acts for which you have been sentenced make you unqualified and unfit to work at our plant. You have admitted to committing arson and to attempting to financially benefit from the same. Therefore, Westlake cannot continue to employ a known, admitted arsonist in its own chemical plant, where flammable and dangerous chemicals are present, due to the safety concerns and liability risks created.

Additionally, and as an independent second reason for discharge, Westlake has the right to protect its business reputation, which would very likely be harmed by employing an admitted arsonist, who put lives in jeopardy, as part of a scheme to defraud an insurance carrier. Judge Hummel rightly observed that the firefighters who reported to the fire, which you intended to be "explosive," left their families, didn't know if they were coming back home, and didn't get paid for their efforts to stop the fire while you wanted to cash out. Westlake's reputation would be harmed for employing a known, admitted arsonist in our chemical plant who exposed innocent lives in the community to serious injury or death.

A third independent reason for discharge is the public display of dishonesty in pleading guilty to your attempt to defraud an insurance carrier. Indeed, the judge observed that even in your three-and-a-half hour interview during the state's investigation of the fire, you lied for 2 1/2 hours. We depend upon the honesty of our employees in running our chemical plant.

Your sentence also renders you unqualified for the position as E-Man. Under the Rules Covering The Operation of the Plant—Rules for Absentee Control, you are subject to termination upon incurring nine (9) chargeable occurrences, which will occur upon your reporting to prison to serve your sentence, or alternatively, you are subject to termination when you are "absent…from work for a period of seven (7) consecutive days and without justifiable cause [do] not personally or in writing notify [your] supervisor or the Personnel Department." (CBA Article XIII, Section A, Seniority, paragraph 4(d).

While your felonious actions did not occur at work, they most assuredly affect your employment as outlined above, and they constitute just cause for discharge. Accordingly, you have given us no choice by to terminate your employment.

Bensinger testified as to the deliberations that went into the decision to terminate the Grievant. He pointed to the statement by the Judge in the sentencing transcript that the Grievant had been tested for drugs and Subutex, "not currently prescribed" was found in his system. He also noted that the Judge found that the Grievant had committed a violent crime and that the crime had received attention in the media. And, he deemed it significant that the document made clear that the Grievant was going to prison.

The sentencing transcript shows the Judge colorfully describing the heinous nature in which he viewed the Grievant's conduct. He asserted that the fire was an act of violence intended to be "like something out of Die Hard," because gas valves were left open. He considered that the Grievant's actions endangered the lives of firemen and first responders

who might not be returning to their families. He felt it especially reprehensible that the Grievant had used another drug addicted person, a co-defendant, to start the fire for him. His sentencing decision was based on keeping the Grievant in prison for as long as his co-defendant had to serve. The Judge also took great offense at the stylistic choices made by Grievant's counsel in his brief, finding it insulting that he had written that the Grievant's conduct was "aberrant, as opposed to typical." The Judge read that simple statement as the Grievant's counsel's assertion that he, the Judge, was too dumb to know the meaning of the term "aberrant". He also found the Grievant's counsel to be insulting him in his brief by properly arguing on behalf of his client, as is his duty, that the offenses were non-violent, a position supported by legal precedent.

The sentencing transcript also reports statements by the Assistant Prosecutor who stated that the State wanted to reach an arrangement where the Grievant could keep his job under work release. She noted that the Grievant had cooperated with his arrest and the investigation, turning himself in to police promptly upon being requested and providing investigators with the password they would need to access video recordings of the events during the night of the arson. She believed he would have cooperated if needed with the prosecution of his co-defendants. She stated that he had been interviewed by the Drug Task Force and provided useful information to them. She spoke to the Sheriff and all of the other officers involved in the case and they were in agreement that an arrangement for the Grievant to be able to participate in work release was acceptable. She also noted that the Grievant's co-defendant had been sentenced to prison only after he, too, had been offered and rejected leniency in exchange for participation in drug court. Thirty-six letters in support of the Grievant were filed with the Court prior to sentencing.

Bensinger stated that the chemical plant presented many risks with regard to fire and explosions that a person who might be having a bad day could set off. That could cause injuries and release of chemicals that could affect employees and the communities around the plant. He noted that, in addition to access to volatile substance in the Cal-Hypo department

where he worked, the Grievant would have access to other areas of the plant where he could cause catastrophic damage. Based on the hazards at the plant that could result from misbehavior by an employee Bensinger stated that the plant could not employ an admitted arsonist, especially one who intended to benefit financially from the crime. He noted that the General Rules of Conduct at the plant proscribe the Grievant's conduct.

The General Rules of Conduct also proscribe "stealing (including attempts), dishonesty, deceit." Bensinger noted that the Grievant had been dishonest in pleading not guilty to the charges, by forming a plan to defraud an insurance company, and in lying to the investigating officers.

Bensinger produced two newspaper articles, one from the Wheeling Intelligencer and one from the Intelligence, reporting on the sentencing of the Grievant. He testified that other articles appeared during the criminal process and it was covered by local TV stations. He believed that employing the Grievant would impair the Company's reputation for safety.

With regard to the charge of dishonesty, Bensinger noted that in addition to the insurance fraud the Grievant had been dishonest in the investigation of the arson incident, adding, "he certainly displayed this propensity to be dishonest." He noted that the Company depends on its employees to be honest and that that some employees have reports such as environmental reports to make.

Bensinger also discussed the Rules Covering The Operation Of The Plant which the Company has adopted to guide its disciplinary actions. He noted that consideration of an employee with five felonies is not a situation the rules envisioned and is not expressly covered by the rules. He observed, however, that the Rules do provide, "Improper conduct not listed above will be reviewed by the Plant Disciplinary Committee and assigned an appropriate classification." The disciplinary committee did review the Grievant's situation and deem it an Intolerable Offense meriting discharge on the first offense.

The Rules also address absenteeism. Through a series of intermediate corrective steps the Rules provide that upon a ninth occurrence of absence within twelve months an employee

is subject to discharge. Bensinger acknowledged that the Grievant was discharged before he went to prison and had actually incurred the nine absences, but the review of the sentencing document made clear that the Grievant was going to prison and that the nine absences were going to occur. Accordingly, absenteeism was added to the discharge letter at that time. Bensinger added that the Collective Bargaining Agreement provides for the end of continuous service for seniority purposes when an employee "Absents himself from work for a period of seven consecutive days and without justifiable cause does not personally or in writing notify his supervisor or personnel department."

On cross-examination Bensinger acknowledged that the Grievant had no stains on his personnel record other than one incident where he failed to timely complete a training exercise. He characterized that infraction as minor and not uncommon. He agreed that the Grievant did not miss any scheduled work days before he went into prison and that he was suspended before he went to prison. He agreed that the plant regularly gives its employees drug tests and that the Grievant had not failed any tests. The Grievant supplied the Company with evidence that he had received treatment of a month at Gateway Rehab, and Bensinger was aware that he had sought treatment at a facility in Pennsylvania as well. Bensinger stated that he relied heavily on the Judge's statements in the sentencing transcript in evaluating the Grievant's conduct. There was no indication from the Grievant while he was at work that he was dangerous to employ and he was permitted to work after he had pleaded guilty. The Grievant had received positive safety evaluations while working.

Bensinger was asked about the handling of an employee who was driving while intoxicated, led police on a high speed chase and then leapt into the Ohio river in an effort to escape. Although he was not at the plant when that incident occurred, he admitted that the circumstances would endanger police. That individual, however, was not discharged. Bensinger also acknowledged that another employee had falsely represented to the Company that he needed to be off work to obtain medical attention for his son when in fact he spent the time in jail. According to Bensinger he was given a one day suspension.

Bensinger admitted that during the grievance process the Union discussed the hiring of Ryan Cisar in an effort to show unequal treatment of other employees when compared to the Grievant. Cisar was said to have served time in prison for homicide and had been in a serious auto accident while intoxicated. But Bensinger denied any personal knowledge of Cisar's record. Bensinger admitted that the newspaper articles regarding the sentencing of the Grievant do not mention his place of employment, but he asserted that the sentencing transcript did mention it and that anyone present at the sentencing would have heard it. The sentencing transcript identified the plant as PPG, a former name of the plant before it was bought by Axiall and then Westlake. Bensinger stated that the Company had not lost any customers as a result of the arson incident, even during the month he was at work after his plea and before his sentencing.

Joe Dobson is the unit manager for the Cal-Hypo and PELS departments at the plant. He is responsible for the calcium hypochlorite and the PELS production areas, overseeing all aspects including safety, environmental, and health issues. He testified that the control operator could put the Company out of range on environmental compliance if he acted improperly and he could cause chlorine or decomposition issues. He must be honest so when something wrong occurs it can be addressed appropriately. He stated that if an area operator wished to do damage he could release chlorine gas into the environment or cause combustion from the materials in the plant. Dobson noted that they keep records and must be honest, and they have to honestly report issues they encounter. The dry side operator, if he wanted to cause damage, could start a fire in the Cal-Hypo. The Cal-Hypo operator also could start fires or otherwise cause damage to the process. Dobson said he would not be comfortable if the Company reinstated the Grievant given what he had done.

Albert Bondy is day foreman at the plant in the Cal-Hypo department. He oversees the operations of the dry side, the packing floor, the prep plant and the NaSH handling area. He was with the Company in 2012 when a fire occurred. He heard a bang while he was in his office and saw people running out of the packing area and flames coming out of the roof. One

employee was injured due to inhalation.  Fire in Cal-Hypo gives off a very strong chlorine gas.
Bondy stated that he would be very uncomfortable is the Company reinstated the Grievant.
Bondy was not sure the exact cause of the fire, but he noted that since that fire bags of
material were no longer stored on the packing floor.  He also stated that the Company initiated
a procedure where if the product bins got to be 98 degrees or higher they would not pack ton
bags, but would go to one hundred pound or 425 pound drums.

Roland Robertson, Jr. is logistic supervisor of Cal-Hypo shipping.  He is in charge of all
of the movement of Cal-Hypo products from production lines to off-site warehouses.  He was
aware of two fires involving Cal-Hypo during his employment.  The first was less significant, but
it still required the use of outside resources for safety and shutting down Rte. 2 which runs by
the plant.  The second fire, a warehouse fire, was more significant and required shutting down
the nearby rail line and water traffic on the Ohio river as well as shutting down Rte. 2.  He
stated that he would not be comfortable bringing the Grievant back to work because he is
aware of the risks presented by working at the chemical plant, but he did not want to have the
additional risk of someone setting a fire on purpose.  Robertson was aware that part of the Cal-
Hypo process involves a product cooler that was not operating properly.  He noted that the
cooler is not needed on cool days where the ambient temperature is below 70 degrees.

David Wheeler is president of the local union.  He had previously served as vice-
president and as a steward.  He stated that the Grievant had been a model employee during
his time at the plant and the only thing on his record, the failure to timely complete a safety
training was very minor.  He testified that the Grievant was fired because he was going to miss
work, but that at the time of the first step grievance meeting the Grievant had not missed any
work.  Wheeler said he understood that the Grievant was prescribed Oxycodone after suffering
a severe injury in a car wreck and he became addicted.  He talked to the Company during the
grievance process about how the Grievant needed assistance through the Natrium
Employment Assistance Program rather than losing his job.  Wheeler was not aware of any
employee who had concerns about working with the Grievant.

Wheeler was familiar with Ryan Cisar. Cisar had been in an automobile accident when he was driving while intoxicated, killing five people. He was found guilty of a felony and spent time in prison. The Company hired Cisar after he was released from prison. Wheeler stated that he had not heard from any other employee or supplier expressing the opinion that the Grievant ought not to be allowed to return to work.

Wheeler recounted other incidents where injury or damage had occurred at the plant. In 2014 two employees in the caustic department were severely injured, one fatally, when a line opened up and they were sprayed with caustic. OSHA fined the Company after finding several things that were being done wrong. Wheeler stated that bags of Cal-Hypo that are going to be dumped because they are decomposing were being stored in an area for longer than they were supposed to be. He stated that part of the process of making Cal-Hypo involves a product cooler which is out of service. He recalled an employee approaching him after a bag of Cal-Hypo he was handling caught fire. That employee related that the product cooler being down was why the product was hot, and that he ought not to be blamed. Wheeler recalled that in 2013 there was a flue gas leak at the powerhouse that was reported to the Company but not fixed until a safety hazard report was filed. He recalled a hydrogen leak that the Company did not address until OSHA was contacted. Another hydrogen leak occurred when the Company was installing a new boiler but did not proof test the hydrogen side. Employees reported to Wheeler that the PELS floor was leaking onto the ground floor below it and infiltrating the air there. Wheeler personally investigated that situation, and brought it up at the next union-management meeting. The Company corrected that problem by hanging a tarp from the first floor. That had they effect of collecting the material in a large quantity. The Company failed to permanently fix that problem for more than a year.

On cross-examination Wheeler agreed that not doing a proper "lockout/tagout" was an issue with regard to the caustic spray that severely injured employees. He agreed that two supervisors associated with the accident were fired. He agreed that the Company is working to achieve a safety status known as ASHA VPP, and it is also working on Safe Start Training.

Both of those programs are designed to increase safety as is the Risk Awareness Training and the OSHA mandated ten hour training for all employees. He also agreed that there are weekly safety meetings among employees and daily safety talks. There is also department specific safety training for each department.

Wheeler acknowledged that no fine was imposed by OSHA after it investigated the hydrogen leak on the turbine. And OSHA has not issued citations or fines regarding the PELS floor disrepair.

The Grievant testified that he had been a machinist's mate running turbine generators for the United States navy. He is married and has two children. The youngest child is homeschooled because he has autism and dyslexia. He began working at the plant in 1995. He had an accident in 2010 that caused him to miss six months of work. He was prescribed narcotics. He was later injured at work when he ripped a tendon and required surgery. He started abusing drugs and tried to get help for the abuse at a facility in Weirton where he was given prescription Suboxone. Some of the prescribed Suboxone is what he took the day before he was sentenced for the arson.

He testified to significant stressors in in his life 2017 and 2018. His brother was diagnosed with cancer and given only a year and a half to live. His brother had been his partner in the bar and took care of running it. His brother did all of the accounting work. When he was diagnosed with cancer the Grievant tried to do the work his brother had been doing at the bar, including the accounting. He was aware that some employees were stealing from the bar. During that time a sewer was being constructed in the area which closed the road for a couple of months. The sewer construction also cut a bench in a hillside above a rental house the Grievant owned and the hillside collapsed onto the house. The Grievant became stressed and depressed. He took time off from work and started abusing Oxycondone. After his arrest for arson he went to Gateway, another rehabilitation facility. He found it to be a better facility than the one in Wierton. He got into AA and NA, attending meetings two to three times a week.

Although the Grievant admitted that he stated under oath in court that he committed the offenses with which he was charged and convicted, he asserted that he was told to make those statements in order to get the benefit of the plea bargain. He disagreed with the Judge's assertion that he intended an explosion at the bar because gas lines were left open. He pointed out that the Judge was only referring to the fact that the pilot lights to the kitchen were still on—the gas to the stove had not been turned off. And the Grievant pointed out that the fire was confined to a couch in an upstairs apartment that was a long distance from the kitchen.

He continued working at the plant for approximately one month after pleading to the arson related charges. After the sentencing he was discharged. He takes safety at the plant seriously and is much less stressed than he was because he has put many things behind him. He has his family back and the bar is no longer an issue.

The Grievant stated that he went into rehab soon after the arson incident occurred. When he got out his attorney and the prosecutor worked out a plea deal that would let him keep his job, but the Judge turned it down. He stated that the arresting officers were in favor of the deal as was the prosecutor. His wife does not work and he did not make anything from the bar business. His job at the plant was his only income. He does not believe he would be a danger at the plant if he returned to work. He just had a drunken night and made some bad decisions. He was still intoxicated when he was answering questions for the police. He had told his co-defendant that he would not mind if the bar were burned down. He then passed out in the bathroom before leaving the bar that night. The fire was started after he left. He told the police what he remembered.

Joe Blatt is the recorder for the Union. He related that employees had made complaints about working with Mr. Wade who was harassing a female employee at the plant. Wade was fired for the harassment but later reinstated after serving a 30 day suspension. Blatt stated that Steve Jarvis had set debris on the packing floor on fire. He was terminated for that. But at the same time supervisors had been in the habit of preparing food on a grill on the wet side

of the Cal-Hypo department. The supervisors were not disciplined. Chuck Meyer was the employee who lied about needing medical care for his son when he was actually in jail. He was given a one day suspension for that offense. Blatt also recalled Jerry Mullens, the plant manager stating that an actuarial study had been performed showing the cost of Union proposals during contract negotiations. It was later revealed that no study had been performed. On cross-examination Blatt admitted that both the Wade and the Jarvis matters were settled on non-precedential bases. He admitted that Meyer was disciplined according to the work rules.

Joe Dobson is a member of the joint safety committee at the plant. It is working on a safety plan that includes risk awareness and other features. The committee meets with other industry representatives and consults with other Company sites for safety ideas. He said that the Company also does OSHA 10 hour training for all of the employees. That training focuses on OSHA requirements and guidelines. The Company uses computer based safety training for each employee every one to three years. The Company also has its operators meet monthly on safety issues and weekly gang box topics where supervisors go over safety issues with their employees. Permits are issued for various jobs that contain checkboxes for all the safety standard procedures. The back of the job planning tag contains safety instruction that is discussed at every job.

PERTINENT CONTRACT PROVISIONS

ARTICLE VII

Arbitration

1. Only grievances involving alleged violations with respect to the application or interpretation of the terms of this agreement may be submitted by either party to arbitration. The Arbitrator shall have no authority to add to, take from, change or modify any of the terms of this Agreement nor shall he have any authority in the making of a new agreement.

2. The Company and the Union agree to carry out the grievance procedure in good faith before either party shall require arbitration.

6. The Arbitrator's decision shall be final and binding. No facts shall be presented by either party during the arbitration which were not disclosed first to Plant Management and the Union Grievance Committee for consideration prior to arbitration.

ARTICLE VIII

Disciplinary Action

1. The Company retains the right to discharge, suspend or otherwise discipline all employees.

2. The Company shall not discharge, suspend, or discipline any employee without just cause...

ARTICLE XIII

Seniority

4. Continuous service shall end when the employee...[a]bsents himself from work for a period of seven (7) consecutive days and without justifiable cause does not personally or in writing notify his supervisor or the Personnel Department.

ARTICLE XIX

General

1. Except as otherwise provided in this Agreement, the management of the plant and the direction of the working force remains an exclusive management function. This right of management includes, but is not limited to such functions as...the right...to layoff, retire, suspend, discharge, discipline otherwise relieve employees from duty because of lack of work or other proper reasons. In no case shall the exercise of the above prerogatives of management be in derogation of any of the terms and conditions of the collective bargaining agreement between the parties.

## CODE OF CONDUCT

The following list of unacceptable actions is not all-inclusive and is not intended to limit Westlake when it is necessary to take disciplinary action...

> Violation of any Federal, State or local law
> Poor attendance including absenteeism, late start, early quit, etc.

## RULES COVERING THE OPERATION OF THE PLANT

Axiall Corporation-Natrium has established the following rules covering the operation of the plant. The Company expects each employee to recognize and observe such rules. If these rules are violated, employees will be subject to disciplinary action. Discipline is meant to be a corrective action and can be in the form of verbal or written reports, and suspensions; however, certain rule violations can result in immediate termination of employment. Natrium's rules include a process for progressive discipline and disciplinary consequences for minor offenses, major offenses, and intolerable offenses as documented below.

Intolerable Offense. 1st Offense—The consequence will be discharge

Improper conduct not listed above will be reviewed by the Plant Disciplinary Committee and assigned an appropriate classification. Additionally, there may be times an employee will be suspended pending the results of an investigation.

## DISCUSSION AND DECISION

The issue in this labor arbitration case is whether the Grievant was discharged for just cause. The Agreement contains an express just cause limitation on the Company's right to discharge. The Company bears the burden of proving by clear and convincing evidence that the Grievant committed the conduct of which he is accused, that it is conduct that properly subjects him to discipline, that he knew or should have known that it would lead to discipline and that the penalty of discharge is appropriate. The Arbitrator will not simply substitute his judgment for that of the Company with regard to the discipline imposed if he finds that improper conduct has been committed. But if procedural safeguards have been denied the Grievant, or the penalty is so harsh in relation to the offense as to violate notions of industrial due process, the penalty may be modified.

There is no dispute that the Grievant, as a result of the criminal legal proceedings against him was convicted of five felonies stemming from the arson at his bar. He admitted in open court under oath to committing the acts supporting those convictions. There is also no dispute that the those actions occurred off the premises and were not directly related to the Grievant's employment with the Company. The issue, then, becomes whether the fact that the Grievant is a felon convicted of arson and insurance fraud or whether the facts of what he did in committing those crimes are reason for discharge. The Company also discharged the Grievant for absenteeism, a separate grounds that will be addressed after the criminal charges have been considered.

In order to prove that off-premises conduct is proper grounds for discharge the Company must show a nexus between the off premises conduct and the Grievant's work. The Company has argued that the fact that the Grievant was a convicted and admitted arsonist disqualifies him from working in a plant that abounds in hazardous flammable chemicals. It argues that the fact that his conduct violated state law puts him in violation of the Company's Code of Conduct. The Company also asserted that the Grievant's case had received a lot of media attention which would threaten its business reputation if he were reinstated. It argued that the Grievant demonstrated dishonesty in pleading guilty to attempting to defraud an

Page 17

insurance company. Since the Company relies on honesty from its employees, the Company asserts that that acts or dishonesty provide a nexus to his employment that warrants discharge.

The Union argued that the Grievant did not have sufficient notice that his conduct would result in his discharge. Off premises arson attempts are not specifically addressed in the disciplinary rules and fall under the provision "improper conduct not listed above", the penalty for which is determined by the disciplinary committee. The Union faults this rule as a slippery slope that allows the Company too much latitude in discipline. The Union also argues that the Company did not perform an adequate investigation, asserting that the Company's improper action in not allowing Wheeler to participate in the interview with the Grievant taints the investigation. The Union argues that the Company has not applied its rules even-handedly in meting out discipline for similar incidents. And, finally, the Union argues that the Company did not meet its burden of showing the nexus between the off premises conduct and the Grievant's employment.

The Union's complaint that the Grievant lacked notice that his misconduct could result in discharge and that the plant rules fail to provide an adequate basis for determining that issue is not well founded. The Company asserts that certain misconduct is of its nature so heinous as to compel recognition by the offender that harsh consequences will follow. It is impossible in drafting a disciplinary procedure to exhaustively list every act an employee may commit that will result in discipline. So the Company has incorporated a procedure whereby misconduct that is not expressly listed is evaluated and disciplinary action prescribed. That procedure, referral to a disciplinary committee, is reasonable. Reliance on input from several people insures that the disciplinary decision has a measure of objectivity and is not the result of a single person's personal bias or overbearing misjudgment. Moreover, the ensuing decisions are subject to challenge by the Union. Far from being an intolerable "slippery slope", the procedure for evaluating "improper conduct not listed" is reasonable and provides a fair

chance that a good decision will be made with respect to the penalty imposed for unlisted misconduct.

The Union has also argued that the Company has applied standards unevenly in evaluating the grievant's misconduct and imposing discipline. It pointed to several other employees who committed felonies and endangered the public and law enforcement, yet who were permitted to retain their jobs. The Company objected to this proof on two grounds. First the Union relied in part on cases that were resolved pursuant to an agreement between the Union and the Company that they would not be used as precedent in any other case. Secondly, the Company argues that it was not given notice during the grievance process of the facts regarding this issue that the Union produced at the hearing. It is essential to the grievance process that an agreement not to use a case resolution as precedent in a future case be respected. Often a settlement might not be reached if one party or the other thought that the outcome could be used against it in a future case. The Union's evidence and argument regarding the Rush, Jarvis and Wade resolutions were subject to such an understanding and will be disregarded herein.

Although I am sympathetic to the Company's argument that insufficient notice was given that certain facts regarding unequal treatment would be presented at arbitration, the Union did show that it intended to argue that point during the grievance procedure. Discovery in an arbitration case is often uncertain and strict rules regarding discovery can not be applied. Moreover, accommodation was made for the Company to obtain and present evidence in opposition to the evidence presented by the Union. I find that the Company had a full and fair opportunity to address the Union's evidence even if was not apprised of the specific facts the Union brought to arbitration.

The Union's argument with regard to disparate treatment fails, nonetheless, because it simply did not show that matters that were sufficiently similar to the Grievant's case had occurred in the past and had been treated more leniently by the Company such as to create a policy with regard to such incidents. The parties have never previously confronted off premises

arson as a grounds for considering whether an employee ought to continue his employment. Although one employee, Meyers, did spend time in jail for a criminal offense and then lied about it to the Company, the underlying offense was not comparable to the Grievant's offenses. The Union failed to show that the Company was aware of another employee's misconduct, that of employee Cisar. The asserted untruthfulness of Mr. Mullens during the bargaining negotiations is simply irrelevant to this hearing. Off premises criminal misconduct that comes to the attention of the Company is in itself so infrequent that it would be difficult to show a policy established with regard to handling such incidents. The underlying criminal conduct, moreover, will often be unique such that each incident will be judged on its own. Accordingly, I do not find that the Union has shown disparate treatment warranting overturning this discipline.

In this regard, it must be considered that the Rules of Conduct do expressly provide that it is a violation for an employee to violate state, federal or local law. But no penalty is assigned to violation of law. The Company seems to recognize that the vast differences in degree of harm or offense governed by the vast array of society's laws precludes a simple declaration that a given disciplinary penalty will result from any violation. Certainly some violations, such as an isolated minor speeding ticket, would not merit any attention from the Company whatsoever, whereas others, such as participation in a violent terrorist group might be a matter of grave concern. The prohibition against violation of law in the Rules of Conduct gives no basis for discriminating among those laws that are significant and those that are not. Where, as here, the violation occurs off-premises, the Company still must show a sufficient nexus to its business to impose discipline.

The Union also argued that the Weingarten offense committed by the Company in its investigation tainted the investigation such that the discharge can not be sustained. The Company representative believed that the duty to allow representation was satisfied by having a vice-president of the Union present during the interview with the Grievant even though the Grievant insisted that he wanted the President of the Union, Wheeler, to participate. While

refusing to let Wheeler participate was a violation of the Grievant's rights, I do not find that that action so tainted the proceedings as to render the discharge improper. The Grievant advised the Company that he did not wish to make a statement. And no information was garnered during that interview that was used against the Grievant. The grievance procedure provided additional opportunities for the Grievant, with Wheeler's assistance, to present his case. Accordingly, that procedural lapse will not be found to have so tainted the Company's handling of the matter as to require dismissal of the discharge.

The Union also contests the Company's assertion that there was a sufficient nexus between the Grievant's off premises criminal conduct and his employment to justify the discharge. The Company has asserted that the mere fact that the Grievant has been convicted of five arson related felonies is sufficient to disqualify him from further employment. It has well proved that the plant is a dangerous work environment. Fire is a hazard that must be constantly guarded against, and any employee with a desire to start a fire could easily do great damage to the plant, its employees and the community at large.

In emphasizing the fact that the Grievant was convicted of five felonies, however, the Company is asking the Arbitrator to overlook the fact that all of the charges stemmed from a single ill considered act by the Grievant. The attempted arson charge involved the same act as the conspiracy to commit arson and the attempted arson of personal property belonging to another. The attempt to commit insurance fraud was an add on charge at the insistence of the Judge. No insurance claim was filed, although the Grievant admitted that he considered the possibility of recovering insurance money in deciding to commit the crime. The Grievant did not commit five acts of arson showing his inclination toward such conduct, yet the Company seems to be insisting that he be treated as if arson were a dangerous habit the Grievant can not break.

The Grievant showed that he was intoxicated when the fire at his bar was set. He encouraged another man, also intoxicated and addicted to drugs, to set the fire before passing out in the bathroom of the bar and then leaving. Intoxication is not an excuse for the Grievant's

Page 21

misconduct, but it does somewhat undercut the characterization of him as a dangerous and repeated arsonist.  The Grievant saw the bar as a source of great stress in his life at a time he had other stressors affecting him.  It was to eliminate that source of stress, and possibly to profit form the insurance, that he encouraged his friend to start the fire.  He was using drugs at that time, which, while giving him temporary relief from the stress in his life, ultimately made him incapable of handling his problems.  The drugs thereby increased his stress.  There is nothing about those circumstances that translate to his employment.  There is nothing to show that his employment presented a similar source of stress and annoyance or that he takes an arsonists delight in using fire for personal satisfaction.  There was no showing that the Grievant had ever been a safety hazard in his work at the plant.

A finding that mere conviction of arson related felonies does not disqualify the Grievant from employment is compelled most convincingly by the fact that the Company continued to employ him for a month after his conviction.  It was only after the sentencing when the Judge berated the Grievant and his lawyer in uncommonly harsh terms that the Company decided to suspend him pending discharge.  It seems that the Company was unduly influenced by the Judge's findings in the sentencing transcript in making its decision to discharge the Grievant and it gave little consideration to the underlying facts.  Both the letter of termination and Bensinger's testimony emphasize that great reliance was place on the Judge's statements during the sentencing as a basis for the discharge.

The sentencing transcript and the entire handling of the Grievant's case was extraordinary and not a credible portrayal of the nature of the threat the Grievant's conduct poses to his employment.  The Judge characterized the setting of the fire to a premeditated attempt to cause an explosion by leaving open gas valves.  He found that that could have created a conflagration like something out of the movie Die Hard.  What seems more fitting to the facts, however, is that the Grievant's intoxicated co-defendant didn't think to turn off the gas to the kitchen stove before starting a fire on a couch in an apartment away from the kitchen.  The Judge wailed at the possibility that fighting such a conflagration could have killed

emergency responders who would leave families to mourn their losses. No one was injured fighting this fire, and in fact the firefighters did not need to get their hoses out to extinguish it. And first responders were among the parties agreeing to lesser punishment involving work release. I do not here find that the Grievant's conduct was not reprehensible and very dangerous. But the Judge's characterization of it exaggerates the facts beyond usefulness to evaluating this case. Undue reliance on one man's bombast seems to have caused the Company to abandon its obligation to make an independent review of the Grievant's conduct and the effect that had on his employability at the plant.

Of great importance to the Judge was the fact that the Grievant's co-defendant had been sentenced to prison and he believed that, as the chief instigator of the crime, the Grievant ought to serve at least as much time as the man he took advantage of and used as his villainous tool. The Judge deemed it unworthy of consideration, however, that the co-defendant was in prison only because, unlike the Grievant, he was unwilling to accept treatment for his drug addiction in exchange for leniency.

The Company gave little or no weight to those parts of the hearing transcript that were not vitriol from the Judge. Even after the Judge had made known his personal interest in giving the Grievant the maximum penalty, and even after the Judge rejected a plea bargain for a lessor punishment, and even after the Judge took gratuitous sideswipes at the Grievant's counsel for zealously and with reason arguing on behalf of his client, the Assistant Prosecutor stood and repeated to the Judge the interest of the state: simply to get a felony on the record, to get cooperation in the case and information regarding drug use in the area, to get the Grievant into treatment for his drug addiction and *to put him in a position to work while under sentence*. The emergency responders were in agreement with those goals. Everyone involved in this matter, everyone who was in a position to judge the Grievant's conduct believed that he should be allowed to continue working at the plant. Only the Judge in his discretion wanted more than a pound of flesh from the Grievant in punishment for his crime, but *even the Judge agreed to delay the onset of his sentence so the Grievant could continue to work at the plant.*

Page 23

It is not unusual for multiple charges to result from a single criminal act. It is common for the Prosecution and the Defense to then sift through those charges, evaluate the seriousness of the underlying offense and come to an agreement regarding the proper disposition. It remains for the Judge to approve or disapprove of that decision. But the State's opinion in the matter is recognized in the criminal justice system as being worthy of weight and due consideration. Consideration of that opinion nor the underlying facts on which it was based seems not to have been afforded the Grievant in this case.

Throughout his plea negotiations the Grievant had one chief objective, being able to retain his job. It was not shown whether the Company was consulted about whether it would permit him to continue employment if he were convicted of the felonies he was charged with. But everyone involved in the matter seemed to believe he could continue working at the plant. Even the Judge, after excoriating the Grievant and his lawyer at the sentencing, decided to delay entry into prison while the Grievant continued working in hopes of reaching retirement. Even more significant than those opinions, however, is the Company's own decision to continue the Grievant's employment after his convictions. It is evident that the Company did not consider the Grievant's conduct or his convictions alone as providing a sufficient nexus to his employment such as to support his discharge for off premise conduct. Only after the Judge had excoriated the Grievant and his lawyer at the sentencing hearing did the Company decide not to permit him to continue his employment at the plant.

The Company also asserted that the media attention the Grievant's case attracted would cause damage to its reputation such that a nexus between his criminal conduct and his employment could be found. In support of this argument, the Company introduced two newspaper articles reporting on the sentencing. Neither of those articles mentioned the Grievant's employment at the plant. The Company showed that the case had attracted other media attention, but it did not show what that coverage had reported or whether the plant had been mentioned at all. The Company has the burden of proving that its reputation has been tarnished by the criminal proceedings against the Grievant and such proof as was adduced at

the hearing wholly failed to do so. Similarly the Company witnesses speculated that it might lose customers or suffer worsening relations with its suppliers if the Grievant were reinstated, but no proof of those speculations was made at the hearing. Finally, a few management employees testified that they would be uncomfortable working with the Grievant after his convictions. But the Union adduced evidence that other employees were not concerned, and, again, we have the opinions of the prosecutor, citizens who wrote to the Court in support of the Grievant and the Judge himself that continued employment of the Grievant would not be a problem. Accordingly, I find that the Company has not proved that a nexus between the crime the Grievant committed and his employment existed on account of damage to the Company's reputation.

Finally, the Company argued that a nexus between the Grievant's crime and its aftermath was shown because he proved himself to be dishonest and the Company requires honesty from its employees. The Company clearly showed that honesty is important in its business. Employees provide reports of their work and findings the accuracy of which are essential to both the safe operation of the plant and its ability to comply with and demonstrate its compliance with various regulations. The Grievant was not shown to have engaged in any at of dishonesty with respect to his employment. The Company bears the burden of proving that his off premises misconduct shows him to be so inherently dishonest that the Company can not rely on him to perform his job duties honestly at work.

As an initial matter Bensinger stated he believed that the fact the Grievant initially pleaded not guilty was an instance of dishonesty which contributed to his finding that the Grievant was so dishonest as to be disqualified from employment. Of course the Employer did not advance that argument in its brief. Bensinger is not a lawyer and he understandably may not have realized that a plea of not guilty is simply a legal device whereby the defendant demands that the state proceed to prove its case. It is not a statement on which a defendant's honesty may be judged. That fact that Bensinger seized on that simple procedural occurrence to find reason to judge the Grievant harshly does suggest that the Company was caught up in

the drive to punish the Grievant harshly, following the example set by the Judge in the sentencing document, and not weighing the facts on their own merits.

The Company relied heavily on the fact that the Judge in the sentencing transcript found that the Grievant had lied for two and a half hours of the three and a half hours he spent being interviewed by the police. I, like the Company have no reason to doubt the Judge's assessment of that interview. But the Assistant Prosecutor also said the Grievant was forthcoming and helpful in the investigation. The Grievant testified that he was still intoxicated when he was interviewed by the police. No doubt he was trying to figure out what he could say to extricate himself from the terrible situation he created for himself. No doubt he was not honest throughout the interview, as the Judge asserted. But trying to extricate himself from that situation, while still intoxicated (and unsure exactly what had happened after he first passed out and then left the bar) does not show the Grievant to be an inherently untrustworthy individual.

The Company also relied heavily on the fact that one of the charges the Grievant pleaded guilty to was an attempt to defraud an insurance company. But, again, circumstances suggest that the plea does not show the Grievant to be so dishonest as to disqualify him from his work. That charge was an addition to the list of felonies the prosecutor deemed appropriate to the facts. No fraudulent claim was filed, although the Grievant was never really in a position to make such a claim, given that he was arrested shortly after the fire. The Grievant's drug addled scheme of desperation to get out from under his many life's problems just does not seem to translate to him being unable to perform his job duties at the plant. Again, that danger did not present itself to the State when it argued for work release, or to the Judge when he delayed onset of the sentence in favor of allowing the Grievant to continue to work and it did not occur to the Company when it employed the Grievant for a month after his convictions. Accordingly, I find that the Company has failed to prove a sufficient nexus between his off premises conduct and his employment to form a basis for discharge.

Finally, the Company argues that the discharge ought to be upheld on the basis of his absenteeism resulting from the five months he spent in jail. This charge can not be upheld for the simple reason that the Grievant did not in fact miss any work. He was suspended immediately after the sentencing. He was discharged after that. The Company cannot punish the Grievant for missing work he was not scheduled to perform and was prohibited by the Company from performing. I do not here ask the Company to engage in an absurdity. It seemed clear at the sentencing that the Grievant was going to prison, he was being denied work release and would face a lengthy period of time when he would be unable to work. But in its action to discharge the Grievant for absenteeism even before he missed work the Company prejudged the Grievant's future and his opportunities to modify his sentence. And it foreclosed its own willingness to work with its very damaged employee and keep him in the workforce. The Grievant had no opportunity to apply for consideration by the Company and a leave of absence to cover his time in prison. Every party involved in the handling of the Grievant's criminal case hoped to afford him the opportunity to continue his employment except the Judge. It is possible that the Judge could reconsider his decision based on the weight of opinion in favor of work release. Even the Company seemed willing to continue his employment after his conviction. In this regard the Union's argument that the Company did not fairly investigate the matter may have some traction. The Company relied on an incredibly harsh characterization of the Grievant's offense in a sentencing document in his criminal case to reverse its own determination that the Grievant remained fit for employment even after his convictions. It then charged him with absenteeism before he was absent from work. That can not stand. I find that the Company has failed to prove that the Grievant was properly discharged for absenteeism.

Based on all of the foregoing reasons I find that the Grievance should be sustained. The Company failed to show a nexus between the criminal act the Grievant committed and his employment. It further failed to prove that the Grievant's discharge was supported by his absenteeism.

The Union, in its brief has suggested that the remedy in this case be made contingent on continued drug testing. Such a remedy was not previously discussed at the hearing and no proposal was made with respect to testing outside of the Union's brief. It may be, however, that such a creative remedy would serve both the Grievant's best interest in providing another tool for him to use to remain sober and the Company's best interest in knowing that their at risk employee is either sober or may again be a risk for employment. Because the structure of such a remedy has not been litigated, I will not impose such a requirement on the parties herein. Issues such as who will bear the cost of testing, how long the testing will go on, and what might be the use of the test results are not clear. I will retain jurisdiction, however, for the parties to discuss the issue and if they deem it appropriate they may ask for a modification of the remedy. I will retain jurisdiction for any such application for modification the parties may wish to present for one month after the date of this award.

### AWARD

For all of the foregoing reasons the grievance is sustained. The Grievant is ordered to be reinstated into his employment at the plant, he is awarded back pay and benefits for the time he ought to have been working. I retain jurisdiction of the case for one month after the date of this decision for the purpose of clarification of the remedy if the parties are unable to agree between themselves.

May 13, 2020
Charleston, West Virginia

Charles S. Dunn, Arbitrator

Page 28